# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| Charles Coma, by and through<br>his next friend, Donna Coma, | : | |
| | : | |
| Plaintiff | : | |
| | : | Civil Action No.  _____ |
| | : | |
| v. | : | |
| | : | |
| | : | *Electronically Filed* |
| United States of America, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

### PRELIMINARY STATEMENT

1. This is an action asserting tort claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.*, arising from a brutal assault on Plaintiff Charles Coma in the Special Management Unit ("SMU") at USP Lewisburg.  Mr. Coma suffered serious injuries as a result of this incident, including permanent and debilitating brain injury and cognitive impairment.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b), and 2671, *et seq*.

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1402(b) as the actions at issue in this matter occurred in Lewisburg, Pennsylvania, which is located within the Middle District of Pennsylvania.

4. Plaintiff has exhausted his federal tort claim administrative remedies as he filed an Administrative Tort Claim (Form 95) on February 20, 2018 and received a final denial of this claim in writing from the Federal Bureau of Prisons' Northeast Regional Office dated September 20, 2018.

## PARTIES

5. Plaintiff Charles Coma is a citizen of the United States.  At all times relevant to this Complaint, Mr. Coma was incarcerated in the federal Bureau of Prisons institutions at USP Canaan in Waymart, PA and in the SMU at USP Lewisburg in Lewisburg, PA.

6. Mr. Coma is no longer incarcerated and resides in Shelton, Washington.  He suffers from severe and permanent brain injury and is unable to live on his own or take care of his daily needs.

7. Mr. Coma is not able to sustain a thought or a conversation for more than several minutes at a time and is not capable of representing himself in this action.

8. Donna Coma, Mr. Coma's mother, brings this action as Charles Coma's "next friend" pursuant to Federal Rule of Civil Procedure 17(c)(2).

9. Mrs. Coma has Power of Attorney for Mr. Coma (attached hereto as Exhibit A) and is in the process of petitioning the court in the state of Washington for legal guardianship of Mr. Coma.

10. Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.

11. At all times relevant to this Complaint, all BOP employees described herein were acting within the course and scope of their employment with the BOP and were acting as investigative and/ or law enforcement officers.

## FACTS

12. The incident underlying this lawsuit occurred in the Special Management Unit (SMU) at USP Lewisburg in Lewisburg, Pennsylvania.

13. USP Lewisburg is a high-security federal penitentiary.

14. All prisoner movement in the SMU is controlled by correctional staff, and prisoners remain in their cells the majority of the time.

15. The doors to cells in the SMU remain closed and locked at all times, except when a prisoner is being escorted into or out of the cell by staff.

16. The cells in USP Lewisburg's SMU were originally designed to house only one person per cell.

3

17. Prisoners are housed, usually two to a cell, in tiny cells measuring approximately 8 by 11 feet.

18. The cells are so small that two men cannot walk in the cell at the same time.

19. SMU prisoners are kept in these cells together for 23 to 24 hours per day, eating all meals in their cells, and only being released to go to "recreation" which is supposed to occur in outdoor cages one hour per day, Monday through Friday.

20. On Saturdays and Sundays, there is no recreation, and prisoners must remain in these close quarters with each other for 24 hours a day.

21. The men who are incarcerated in the SMU in these conditions are described in BOP materials as being the most disruptive in the federal prison system.

22. SMU prisoners often have histories of violence and aggression both inside and outside the federal prison system and are frequently referred to in the media by BOP staff and spokespeople as "the worst of the worst" inmates in the federal prison system.

23. Under BOP policy in effect in 2015, in order to be placed in the SMU, a prisoner must meet one of the folowing criteria:

   a)The prisoner participated in or had a leadership role in a disruptive geographical group – or gang-related activity;

   b) The prisoner had a history of serious or disruptive disciplinary infractions;

c) The prisoner committed any "100-level" prohibited act, according to 28 C.F.R. Part 541, after being classified as a member of a "Disruptive Group" pursuant to 28 C.F.R. Part 524;

d) The prisoner participated in, organized, or facilitated any group misconduct that adversely affected the orderly operation of a correctional facility; and/ or,

e) The prisoner participated in or was associated with activity such that greater management of the inmate's interaction with other persons is necessary to ensure the safety, security, or orderly operation of BOP facilities or protection of the public.[1]

24. Mr. Coma was transferred to the SMU at USP Lewisburg on or about November 15, 2015.

25. Immediately prior to this transfer, Mr. Coma was incarcerated at USP Canaan, located in Waymart, Pennsylvania.

26. USP Canaan is also a high security federal institution located in the Middle District of Pennsylvania.

27. Mr. Coma was housed at USP Canaan for approximately five years, mostly in General Population.

28. On or about August 18, 2015, Mr. Coma's cellmate at USP Canaan assaulted several staff members, causing injuries to at least one staff member.

---

1   *See* BOP Program Statement PS 5217.01 (effective November 19, 2008).

29. After this incident, Mr. Coma's cellmate was placed in disciplinary segregation and was found guilty of assault in the BOP's disciplinary process. He was thereafter transferred to the BOP's super max institution – USP Florence Administrative Maximum in Florence, Colorado ("ADX").

30. He was criminally charged for this assault on staff and pled guilty to the charges.

31. Soon after the assault on staff by his cellmate, the BOP transferred Mr. Coma from General Population to the Special Housing Unit (SHU) at USP Canaan.

32. Mr. Coma was thereafter transferred to the SMU at USP Lewisburg.

33. Mr. Coma did not meet the criteria for placement in the SMU.

34. According to official BOP policy, placement in the SMU is "non-punitive."

35. Despite this statement of official BOP policy, Mr. Coma's placement in the SMU at USP Lewisburg was done as unofficial punishment for the actions of his cellmate at USP Canaan.

36. On information and belief, this type of informal punishment was, and is, frequently imposed on BOP inmates who are perceived by staff and administrators as "troublemakers."

37. On information and belief, BOP staff issued false misconduct reports or fabricated other reasons to justify, on paper, Mr. Coma's transfer to the SMU.

38. Prior to coming to USP Lewisburg, Warden David Ebbert had been the warden at USP Canaan where the attack on staff had occurred.

39. Staff members and administrators at USP Lewisburg, including Warden Ebbert, knew about the August 18, 2015 assault on staff at USP Canaan and Mr. Coma's cellmate's involvement.

40. In the BOP, assault on staff is considered by staff and the administration to be the most serious violation an inmate can commit.

41. Under BOP policy, an inmate's mental health conditions are supposed to be considered, evaluated, and monitored prior to and during the inmate's placement in the SMU.

42. Mr. Coma's placement in the SMU was inappropriate due to his severe and longstanding mental health issues.

43. Mr. Coma is a combat veteran and served in the United States Army from 1988 to 1991, in both Panama and the Gulf War.

44. After his discharge from the military, Mr. Coma was diagnosed by the Veterans Administration with Post-Traumatic Stress Disorder (PTSD) associated with his military service.

45. Mr. Coma was also diagnosed with several other serious mental illnesses, including psychotic disorder and bipolar disorder.

46. He had several inpatient mental health hospitalizations prior to his incarceration in federal prison.

47. Mr. Coma took prescribed medication for his mental health conditions.

48. Mr. Coma has been in BOP custody since 2004.

49. Mr. Coma's long standing and severe mental health issues were documented in his BOP file and known to BOP staff.

50. Symptoms of Mr. Coma's mental illness, including PTSD, were also evident in his behavior while in BOP custody, which included angry outbursts, agitation, and anxiety.

51. The restrictive living conditions in an SMU cell, including constant confinement in extremely close quarters with another person and limited, if any, mental health treatment, worsened Mr. Coma's mental health symptoms and related behaviors.

52. Under "normal" circumstances, the cramped conditions and constant presence of another person (and their behaviors and idiosyncracies) create tension, anger, and anxiety between SMU cellmates.

53. Mr. Coma's mental health issues and behaviors exacerbated the tension and aggravation of living with another person for 23 to 24 hours a day in a cramped SMU cell where all movement was severely restricted.

54. The added pressure caused by symptoms and behaviors accompanying mental illness have caused SMU cells to become tinderboxes, greatly increasing the risk that one cellmate will assault the other.

55. Numerous serious cellmate-on-cellmate assaults have occurred in USP Lewisburg's SMU since the "Special Management Program" began there in 2009.

56. Many of these incidents involved inmates who had serious mental illness.

57. In December 2010, Doran Carvalho was savagely attacked by his SMU cellmate who, during the course of an extended assault, bit off part of Carvalho's ear and ate it.

58. On information and belief, that attacker had carried out numerous violent attacks on prior cellmates at USP Lewisburg, and his propensity to attack his cellmates was well known to USP Lewisburg prison staff.

59.  On or about March 25, 2015, an SMU prisoner was assaulted so badly by his cellmate that he was taken to the hospital for medical treatment of his injuries.

60. In August 2015, an SMU prisoner was involved in an altercation with his cellmate and died of his injuries the next day.  On information and belief, he suffered from serious mental illness and was not being provided with proper mental health treatment.

61. In October 2015, approximately one month before Mr. Coma arrived at the SMU, another prisoner with serious mental illness was killed by his cellmate in his SMU cell at USP Lewisburg.

62. This attacker had a well known history of assaulting others as well as severe mental health issues.

63. As of mid-November 2015 when Mr. Coma arrived at the SMU, administrators, supervisors, and staff at USP Lewisburg knew about these incidents and the

conditions and circumstances that had led to them.

64. Information about such incidents was conveyed to administrative and supervisory BOP officials, both inside and outside of USP Lewisburg, through the use of reports (including After-Action Review Reports), internal audits, incident reports, disciplinary reports, complaints (including administrative remedies and appeals) made by inmates and their families, and administrative tort claims and lawsuits filed by inmates and their families.

65. Upon information and belief, other communication methods (including email, internal memoranda, and meetings) were also used to convey information about these inmate-on-inmate attacks in the SMU to supervisors at USP Lewisburg, at the Northeast Regional Office of the BOP, and at the BOP's Central Office in Washington, D.C.

66. Information about these incidents was also maintained in the BOP's computer system and in documents pertaining to inmates' disciplinary proceedings.

67. Despite the serious and sometimes deadly consequences of putting the so-called "worst of the worst" inmates, including those with serious mental illness, together in a tiny cell, staff at USP Lewisburg's SMU routinely refuse to take any action prevent serious injury and death.

68. Instead, SMU staff, supervisors, and administrators at Lewisburg adhere to an informal yet strictly followed rule that unless and until a violent assault occurs

between cellmates, no action will be taken to protect the health or safety of the inmates.

69. BOP administrators in the Northeast Regional and Central Offices knew about the serious and sometimes deadly results of these practices in Lewisburg's SMU yet have failed to take any actions to prevent such attacks from recurring.

70. Serious cellmate-on-cellmate attacks have continued in the SMU at USP Lewisburg.

71. Such refusal by BOP staff and administrators to take steps to maintain security, safety, and order in the SMU blatantly contravenes the BOP's stated mission, which is to "protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane and . . . appropriately secure . . ."[2]

72. Upon his arrival at the SMU in November 2015, Mr. Coma was placed in a cell on E Block with a cellmate who had been in the SMU for less than one week.

73. The cellmate had a history of violently assaulting other inmates, including one incident in the BOP system which resulted in the victim's death.

74. The cellmate was prosecuted for and pled guilty to homicide for that incident.

75. USP Lewisburg's Warden, David Ebbert, had been employed at the institution where the cellmate's victim had died, and he knew of that incident.

76. Other USP Lewisburg staff, supervisors, and administrators knew or should have

---

2  See https://www.bop.gov/about/agency/agency_pillars.jsp

11

known of this prisoner's violent history, as it was documented in his BOP file.

77. As was the case with Mr. Coma, the cellmate was not transferred to the SMU because he fit the designation criteria; rather, he had been transferred to the SMU because he was considered too dangerous for the staff at his previous institution to manage in general population.

78. Prior to being placed in the SMU, the cellmate had mostly been singled-celled at other BOP institutions.

79. When he arrived at the SMU, the cellmate informed both Warden Ebbert and the Special Investigative Agent (SIA) that he "didn't do cellies" in the conditions present in the SMU – close quarters with another person for long periods of time.

80. In addition to the usual strains caused by cramped SMU conditions, Mr. Coma's behaviors, likely stemming from his mental illness, increased the tension, anger, and anxiety in the tiny cell he shared with his cellmate.

81. For example, Mr. Coma constantly talked – either to the cellmate, to himself, or to other inmates on the tier, by shouting through the crack between the cell door and the door frame.

82. Given the close quarters in the cell, this behavior quickly annoyed and then angered the cellmate, who told Mr. Coma to keep quiet.

83. Mr. Coma also sometimes made insulting comments to staff as they walked past the cell door.

84. In a prison setting, where cellmates are often held responsible by staff for each others' behavior, this conduct reflected badly on the cellmate and caused further tension inside the cell.

85. Due to his mental illness, Mr. Coma was either unable or unwilling to control these behaviors.

86. In addition, in order to deal with his anxiety and aggression and other symptoms related to his Post-Traumatic Stress Disorder and other mental illnesses, Mr. Coma engaged in "work out" sessions, which consisted of shadow boxing, punching the mattress on his bunk bed, and kicking in the air.

87. These workouts took place in the tiny shared cell for two to three hours every day.

88. Sometimes, when Mr. Coma did the kicking part of the workout his shower shoes would fly off of his feet, sometimes narrowly missing the cellmate.

89. The cellmate warned Mr. Coma repeatedly to take his shoes off to do the workouts, because if a shoe were to fly off and hit him, it would definitely trigger a physical response.

90. Mr. Coma was unwilling or unable to heed this warning, however, and his workouts in the tiny cell continued.

91. It soon became clear to both Mr. Coma and the cellmate that they were not compatible.

92. The cellmate conveyed to Mr. Coma within a few days of celling together that Mr. Coma needed to get moved out of the cell or there would be issues.

93. By "issues" the cellmate meant, and Mr. Coma understood, that the cellmate would seriously assault Mr. Coma.

94. In light of this clear warning, Mr. Coma was extremely concerned for his safety and agreed that he should move out of the cell.

95. Staff, supervisors, and administrators at USP Lewisburg knew about Mr. Coma's in-cell behaviors and their effect on the cellmate, knew that Mr. Coma and his cellmate were not compatible, and knew that Mr. Coma was at risk of being seriously assaulted by his cellmate.

96. Mr. Coma repeatedly asked staff to move him out of the cell.

97. Staff members, supervisors, and administrators at Lewisburg communicated with each other about Mr. Coma's concerns for his safety and his pleas to be moved out of the cell.

98. Within approximately two weeks of arriving in the SMU, Mr. Coma asked a staff person at the cell door to be moved out of the cell because of the problems with the cellmate.

99. The staff member, a male correctional officer, responded "the only way you two will be separated is to fight. There must be blood." or words to that effect.

100.     As the staff member said this, he looked over Mr. Coma's shoulder and

made eye contact with the cellmate, who was in the back of the cell.

101.     The cellmate replied that he "played for keeps," meaning that he did not engage in mere "fights" with other inmates, and that if there were a physical altercation, the outcome would be severe or deadly for the other inmate.

102.     The staff member responded to the cellmate that "it wouldn't be the first time and it won't be the last," or words to that effect, and then walked away from the cell door.

103.     Based on the actions of the staff member, the cellmate believed and understood that staff encouraged him to carry out an assault of Mr. Coma.

104.     Mr. Coma was terrified after this interchange and soon thereafter submitted a written request to staff asking to be moved out of the cell because of problems with the cellmate and the high risk of violence.

105.     Shortly after that, SMU staff members conducted a cell search or "shakedown" of the cell.

106.     During the "shakedown," staff searched only Mr. Coma's property, not the cellmate's property.

107.     Neither Mr. Coma nor the cellmate were in the cell when the shakedown occurred, as they were at recreation.

108.      When Mr. Coma and the cellmate returned to the cell, Mr. Coma's personal property had been strewn all over the cell by the search team.

109.    The cellmate's property appeared to be untouched.

110.    However, the written request that that Mr. Coma had previously submitted to staff asking to be moved out of the cell was later found by the cellmate – during the search, it had been inserted by staff in between the pages of a pamphlet the cellmate had been reading.

111.    After finding the request, the cellmate showed it to Mr. Coma, who was shocked and distraught that staff had intentionally jeopardized his safety in this way.

112.    In the BOP, writing a request to staff (also called a "cop out") complaining about another inmate or expressing fear about another inmate is considered "snitching" or "ratting" and often, predictably, results in a physical assault by another inmate.

113.    SMU staff intentionally placed Mr. Coma's "cop out" into the cellmate's property in order to incite him to carry out an assault on Mr. Coma.

114.    Moreover, the staff member who had initially received the "cop out" from Mr. Coma conspired with other SMU staff for it to be placed in the cellmate's property in order to trigger such an attack.

115.    The cellmate understood these actions by staff as encouragement for him to carry out an assault on Mr. Coma.

116.    Mr. Coma subsequently submitted additional requests to staff asking to be

moved due to his fear of being assaulted by his cellmate.

117.    Sometimes a Lieutenant would come to the cell door in response to such a

request and ask Mr. Coma to discuss the request to be moved.

118.    Mr. Coma would ask to be taken out of the cell in order to speak privately

to discuss his safety concerns.

119.    Sometimes Mr. Coma would be taken out of the cell by staff, including a

correctional counselor, and he would tell them in person about his concerns for his

safety and ask to be moved out of the cell.

120.    Mr. Coma would then be returned to the cell, however, and staff took no

actions to keep him safe or move him to a different cell.

121.    One time Mr. Coma asked a staff member at the cell door to be taken out of

the cell in order to go to the law library.

122.    On information and belief, Mr. Coma planned to refuse to return to the cell

after being taken to the law library.

123.    At USP Lewisburg, if an inmate refused to return to his cell, he would be

punished by being placed in hard restraints and put into a different cell.

124.    Mr. Coma's request was denied by a female correctional member, who told

Mr. Coma "I got a message that you are not to be moved from this cell for *any*

reason – including to go to law library," or words to that effect.

125.    In addition, throughout the time he shared the cell with Mr. Coma, the

cellmate conveyed to multiple staff members, supervisors, and administrators that Mr. Coma was in danger of being assaulted by him.

126.     For approximately three months, the cellmate made it very clear to staff that if Mr. Coma was not moved out of the cell he would be assaulted.

127.     Despite the repeated requests by both men and the clear threat posed to Mr. Coma's safety by being forced to remain in the same cell with the cellmate, SMU staff (including supervisors and administrators) either failed or refused to take any actions to keep Mr. Coma safe.

128.     Instead, shockingly, BOP staff members communicated to the cellmate that he had their permission – and their encouragement – to assault Mr. Coma.

129.      While speaking with the cellmate at the cell door about Mr. Coma, staff members would look at Mr. Coma and roll their eyes – indicating to the cellmate that they, too, were annoyed by his behavior and understood the cellmate's frustration and anger.

130.      On at least one occasion, when the cellmate was conveying to staff that they needed to move Mr. Coma out of the cell for his safety, he commented "I don't babysit these psych patients," referring to Mr. Coma.

131.     The staff member responded "I don't blame you," or words to that effect.

132.     On another occasion, Warden Ebbert came to the cell door while Mr. Coma was lying on his bunk with a towel over his face, either sleeping or pretending to

sleep.

133.     Warden Ebbert looked at Mr. Coma and then made eye contact with the

cellmate and asked him "Is his eye blacked yet?"

134.     The cellmate understood Warden Ebbert's question as stating an expectation

that such an assault would occur and, further, as inciting and encouraging him to

commit such an assault on Mr. Coma.

135.     In addition to written and oral requests to staff, Mr. Coma made several

more desperate attempts to get out of the cell.

136.     In the hope of getting the attention of and assistance from staff members

other than corrections officers, Mr. Coma wrote numerous requests for help to

Psychology staff.

137.     Psychology staff ignored these requests, however, and took no action to

keep Mr. Coma safe.

138.     Instead, Psychology staff compounded Mr. Coma's problems by failing to

provide him with appropriate mental health treatment and the medications which

were prescribed for his mental illnesses.

139.     Mr. Coma also attempted to go on a hunger strike in order to be moved out

of the cell and protect himself from assault by the cellmate.

140.     Under BOP policy, if an inmate engages in a hunger strike he is supposed

to be taken out of the cell and placed in a single cell where he is observed by

19

medical staff.

141.    In response to the attempted hunger strike, on February 25, 2016, Mr. Coma was taken out of the cell by a Lieutenant.

142.    Mr. Coma was then threatened with physical assault by staff and the issuance of incident reports (misconduct reports) if he did not stop his hunger strike.

143.    The Lieutenant then put Mr. Coma back into the cell with the cellmate.

144.    BOP employees' actions, as described above, were done pursuant to an agreement between and among themselves and the cellmate to cause physical and emotional harm to Mr. Coma.

145.    The next day, February 26, 2016, Mr. Coma's SMU cellmate carried out a brutal assault on him, tying a bedsheet around his neck to strangle him.

146.    Mr. Coma was asphyxiated and lost consciousness.

147.    SMU staff did not respond in a timely manner to the cell.

148.    When staff finally arrived at the cell door, Mr. Coma was lying motionless on the cell floor with the bedsheet tied tightly around his neck.

149.    His face was discolored and he was not breathing.

150.    Staff gave Mr. Coma verbal commands through the cell door which he did not respond to because he was unconscious.

151.    Instead of entering the cell and performing life saving measures on Mr.

Coma, staff shot his inert body with a pepper ball gun through the food slot of the cell door as he lay on the floor.

152.     A pepper ball gun is a weapon used to shoot a "pepper ball."

153.     A "pepper ball" is a projectile filled with hot pepper powder (also known as Oleoresin Capsicum, or "OC") which bursts on impact.

154.     OC powder irritates the eyes, nose, throat and lungs and causes shortness of breath.

155.     The use of chemical weapons, including the pepper ball gun, must be approved by the Warden.

156.      There was no legal cause to justify this use of force against Mr. Coma, and the force used was unreasonable and excessive.

157.     The pepper balls caused physical injury to Mr. Coma.

158.      After shooting Mr. Coma with the pepper ball gun, staff entered the cell.

159.      Then, instead of providing emergency medical treatment, staff placed restraints on Mr. Coma's inert body.

160.      Only after that did staff remove the bed sheet that was tied around Mr. Coma's neck.

161.     The bedsheet was tied so tightly that it had to be cut off.

162.     Mr. Coma was removed from the cell on a stretcher.

163.     He was taken to the medical department and then to an outside hospital.

164.    At the outside hospital, Mr. Coma was diagnosed with anoxic brain injury, among other conditions.

165.    Mr. Coma had a tube placed in his trachea in order to breathe and had a PEG tube inserted for feeding, as he was unable to eat due to the collapse of his esophagus.

166.    Mr. Coma experienced severe pain and suffering, both physical and mental, from the assault and the resulting injuries.

167.    As a result of the assault, Mr. Coma suffered from seizure disorder and gastroesophageal reflux.

168.    For a period of time after the assault, Mr. Coma's ability to walk was extremely limited.

169.    Mr. Coma remained hospitalized until March 29, 2016 when he was transferred to the Federal Medical Center in Butner, North Carolina (FMC Butner).

170.    Mr. Coma remained at FMC Butner until December 26, 2018 when he was released from BOP custody, having served his maximum sentence.

171.    Mr. Coma currently resides in Washington state.

172.    He is fifty years old.

173.    Due to injuries sustained during the assault, Mr. Coma is unable to attend to the tasks of daily living and he remains severely cognitively impaired.

174.    He continues to suffer mental and emotional injuries as a result of the

incident described above.

175.    Mr. Coma frequently experiences delusions and sometimes does not

recognize the members of his family.

176.    He must be supervised 24 hours a day for his own safety.

177.    Within a month after his release from custody he suffered a mental health

crisis and had to be hospitalized.

178.    As a result of the SMU incident described above, Mr. Coma continues to

suffer physical impairments, including significant weight loss, difficulty walking,

and difficulty coordinating his arm and hand movements.

179.    He sometimes experiences violent tremors throughout his body which can

last a day or longer.

180.    He is unable to write or hold a pen.

181.    He has scars on his neck and stomach from the tracheotomy and the PEG

tube placement.

182.    Mr. Coma's cognitive and physical impairments are not expected to

improve, and he will require full-time assistance for the rest of his life.

183.    The cellmate's attack on Mr. Coma was foreseeable:  BOP employees knew

that the cellmate would assault Mr. Coma if he remained in the cell.

184.    The cellmate was found guilty of a Code 101 violation in BOP disciplinary

proceedings for this incident – this is one of the most serious violations in the BOP system.

185.    There were no criminal charges brought as a result of this attack.

186.    The BOP has both a statutory duty and a duty under the Constitution to protect inmates in its custody, including Mr. Coma, from harm.

187.    The BOP has a duty to provide a safe environment, including safe housing, to the inmates incarcerated in its institutions.

188.    BOP's written policies and procedures focus on ensuring that inmates are safe and the institution is run in a safe and secure manner.

189.    BOP employees are required to follow BOP policies and procedures, which are contained in program statements, institution supplements, procedures manuals, and post orders, as well as in other documents created and maintained on the institutional, regional and national levels of the BOP.

190.    According to BOP policy, when force is authorized, correctional officers are allowed to use only the amount of force necessary to gain control of an inmate, to protect and ensure the safety of inmates, staff or others, to prevent serious property damage, and to ensure security and good order.

191.    The use of the pepper ball gun on Mr. Coma, as he lay motionless and unconscious on the cell floor with a bed sheet tied tightly around his neck, was in violation of BOP policy.

192.     Supervisory officials at USP Lewisburg were responsible for creating and

implementing policy at USP Lewisburg.

193.     Supervisory officials at USP Lewisburg were responsible, by virtue of their

job duties and tasks, for inmate safety and security in the SMU at USP Lewisburg.

194.     They were responsible for ensuring that correctional staff used force,

including deployment of weapons, in accordance with BOP policies, procedures,

and training.

195.     BOP staff, supervisors and administrators at USP Lewisburg knew or

should have known that Mr. Coma faced a specific and immediate threat to his

safety.

196.     Despite knowing of the specific and immediate threat to Mr. Coma's safety,

BOP staff, supervisors and administrators at USP Lewisburg failed or refused to

take action to protect him.

197.     The actions and inactions of BOP employees as described above were

unrelated to any BOP policy or policy-making, but, rather, were borne out of

laziness, inattentiveness, and/ or carelessness.

198.     Alternatively, BOP employees acted intentionally and with malice towards

Mr. Coma over the course of his incarceration in the SMU from approximately

November 15, 2015 through February 26, 2016 when they agreed and conspired

with and aided and abetted the cellmate to cause the assault to be carried out on

Mr. Coma.

199.    At all times relevant to this Complaint, the conduct of BOP employees as described above was shocking to the conscience.

200.    At all times relevant to this Complaint, the conduct of BOP employees as described above was in willful, reckless and callous disregard of Mr. Coma's rights under federal and state law.

201.    As a direct and proximate result of the conduct of BOP employees described above, Mr. Coma suffered extraordinary damages, including permanent and debilitating brain injury, physical pain and suffering, emotional distress and harm, loss of the enjoyment of life, and lost wages.

## CAUSES OF ACTION

## COUNT I

### Federal Tort Claims Act: Negligence
### (Against the United States of America)

202.  Mr. Coma realleges and incorporates by reference the allegations of paragraphs 1- 201 above.

203.  Defendant United States of America owed a duty to Mr. Coma, breached its duty to Mr. Coma, and this breach was a direct and proximate cause and a substantial factor in bringing about Mr. Coma's injuries and damages outlined above.

204.  The harm suffered by Mr. Coma as a result of Defendant's breach of its duty

was foreseeable.

205.   The acts and omissions of BOP employees described above constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

206.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## COUNT II

### Federal Tort Claims Act:  Reckless Disregard of Safety
### (Against the United States of America)

207.   Mr. Coma realleges and incorporates by reference the allegations of paragraphs 1-201 above.

208.   BOP employees knew or should have known that Mr. Coma faced a specific and immediate risk of physical harm and knew or should have known that they had a duty to address this risk of harm, but, knowing that their failure to act posed an unreasonable risk of physical harm to Mr. Coma, failed to act. This failure to act was in reckless disregard of the risk to Mr. Coma's safety.

209.   As a result of BOP employees' failure to act, Mr. Coma suffered substantial injuries and damages as described above.

210.   The actions of BOP employees constitute the tort of Reckless Disregard of Safety under the laws of the Commonwealth of Pennsylvania.

211.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## COUNT III

### Federal Tort Claims Act: Assault and Battery (conspiracy)
### (against the United States of America)

212.   Mr. Coma realleges and incorporates by reference the allegations of paragraphs 1-201 above.

213.   The actions of BOP employees, as described above, in conspiring with each other and with Mr. Coma's cellmate during the time period of Mr. Coma's incarceration in the SMU to carry out an assault on Mr. Coma, intended to place him in imminent apprehension of harmful or offensive contact.

214.   Such actions caused Mr. Coma imminent apprehension and, further, caused him to suffer harmful or offensive contacts.

215.   There was no justification for these actions, which were done with malice towards Mr. Coma.

216.   As a result of the actions of BOP employees, Mr. Coma suffered the injuries and damages described above.

217.   These actions constitute the torts of assault and battery under the laws of the Commonwealth of Pennsylvania.

218.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## COUNT IV

### Federal Tort Claims Act:  Assault and Battery (aiding and abetting)
### (against the United States of America)

219.   Mr. Coma realleges and incorporates by reference the allegations of paragraphs 1-201 above.

220.   By their acts and omissions described above, BOP employees aided and abetted Mr. Coma's cellmate in intending to place Mr. Coma in imminent apprehension of harmful or offensive contact.

221.   Such actions caused Mr. Coma imminent apprehension of and, further, caused him to suffer harmful or offensive contacts.

222.   There was no justification for these actions.

223.   As a result of these actions of BOP employees, Mr. Coma suffered the injuries and damages described above.

224.   These actions constitute the tort of aiding and abetting assault and battery under the laws of the Commonwealth of Pennsylvania.

225.   Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## COUNT V

### Federal Tort Claims Act: Battery (pepper ball attack)
### (against the United States of America)

226.   Mr. Coma realleges and incorporates by reference the allegations of

paragraphs 1-201 above.

227. The actions of BOP employees, in shooting Mr. Coma with pepper balls through the food slot of the cell door as he lay unconscious on the cell floor caused Mr. Coma to suffer harmful or offensive contacts.

228. There was no justification for these actions.

229. As a result of these actions of BOP employees, Mr. Coma suffered the injuries and damages described above.

230. These actions constitute the tort of battery under the laws of the Commonwealth of Pennsylvania.

231. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## COUNT VI

### Federal Tort Claims Act: Intentional Infliction of Emotional Distress
### (against the United States of America)

232. Mr. Coma realleges and incorporates by reference the allegations of paragraphs 1-201 above.

233. The conduct of BOP employees in transferring Mr. Coma to the SMU as punishment for his former cellmate's actions, knowingly keeping Mr. Coma in a cell with a cellmate who posed a specific and serious threat of harm to him, ignoring Mr. Coma's pleas to be moved from the cell or otherwise protected from

assault, and encouraging the cellmate to carry out the attack on Mr. Coma was extreme and outrageous and shocking to the conscience.

234. BOP employees' actions as described above constitute the tort of intentional infliction of emotional distress under the laws of the Commonwealth of Pennsylvania.

235. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions.

## COUNT VII

### Federal Tort Claims Act: Negligent Supervision and Retention (against the United States of America)

236. Mr. Coma realleges and incorporates by reference the allegations of paragraphs 1 - 201 above.

237. Defendant the United States of America is responsible for the oversight of its employees.

238. BOP supervisory officials have a duty to monitor, supervise, discipline, train and retrain correctional officers and other staff in order to ensure that they properly perform their duties so that inmates are housed in a safe manner and inmates' constitutional rights are not violated.

239. BOP supervisory officials breached the duty of care they owed to Mr. Coma by failing to monitor, supervise, discipline, and train and retrain SMU staff to ensure that Mr. Coma would be safe from violence from his cellmate.

240.   BOP supervisory officials also breached the duty of care they owed to Mr. Coma by failing to monitor, supervise, discipline, train and retrain SMU staff to ensure that they used only necessary and appropriate force on inmates.

241.   By their acts and omissions described above, BOP supervisory officials breached the duty of care they owed to Mr. Coma.

242.   BOP supervisory officials' acts and omissions were a direct and proximate cause and a substantial factor in bringing about Mr. Coma's injuries and damages set forth above.

243.   The acts and omissions of BOP supervisory officials as described above constitute the torts of negligent supervision and retention under the laws of the Commonwealth of Pennsylvania.

244.   Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.


**WHEREFORE**, Plaintiff Charles Coma, by and through his next friend Donna Coma, respectfully asks this Honorable Court to grant him the following relief:

1.   Compensatory damages as to all Counts;

2.   Declaratory relief as to all Counts;

3.   Reasonable attorneys' fees and costs; and,

4.   Such other further relief as this Court deems just and appropriate.

Respectfully submitted,

TOBIN LAW OFFICE, LLC

*/s/ Jennifer J. Tobin*
Jennifer J. Tobin
PA Bar No. 202047
702 N. 3rd Street, # 71
Philadelphia, PA  19123
Tel. 267-258-8918
Fax: 267-428-6493
e: jtobin0913@gmail.com

Date: February 19, 2019           Counsel for Plaintiff Charles Coma